2020 IL App (1st) 192337

No. 1-19-2337

Fourth Division
September 10, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE HANOVER INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| MRC POLYMERS, INC.; MATERIAL RECOVERY | ) | |
| HOLDINGS, LLC; MRC OPERATIONS, LLC; DEAN | ) | No. 2017 CH 3929 |
| EBERHARDT; PLASTIC RECLAMATION | ) | |
| PARTNERS, LLC; PP V (AIV) MRH, LLC; and | ) | The Honorable |
| PLASTIC RECLAMATION PARTNERS HOLDINGS, | ) | Michael T. Mullen, |
| LLC, | ) | Judge Presiding. |
| | ) | |
| Defendants | ) | |
| | ) | |
| (MRC Polymers, Inc., and Dean Eberhardt, | ) | |
| Defendants-Appellants). | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises as a result of two lawsuits filed against defendants MRC

Polymers, Inc. (MRC Polymers), and Dean Eberhardt alleging fraud in selling certain

technology. Defendants tendered the defense of their lawsuits to plaintiff Hanover Insurance

Company, but plaintiff denied the tender and filed the instant suit for declaratory judgment,

seeking a declaration that it did not owe a duty to defend defendants due to an exclusion in their insurance policy. After considering cross-motions for summary judgment, the trial court denied plaintiff's motion and stayed defendants' motion pending discovery. However, after plaintiff filed a motion to reconsider, the trial court granted plaintiff's motion for summary judgment and denied defendants' motion. Defendants appeal, and for the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3        On March 17, 2017, plaintiff filed a complaint for declaratory judgment, seeking a declaration that it owed no duty to defend or indemnify a number of entities, including MRC Polymers, Material Recovery Holdings, LLC (MRH), MRC Operations, LLC (MRC Operations), and Eberhardt, in connection with several lawsuits filed against them.[1] The complaint was amended once, and it is the amended complaint that is at issue on appeal.

¶ 4                                     I. Parties

¶ 5        As the litigation involves a number of similarly named entities, it is helpful to first discuss the various entities and their relationships to each other, taking all facts from the allegations of the amended complaint and its exhibits, as well as from defendants' counterclaims.

¶ 6        MRC Polymers is in the recycled plastics business and is engaged in the business of manufacturing engineering-grade recycled plastic "flake" from postindustrial and postconsumer waste. The instant litigation concerns a proprietary "Washline Technology," used for the processing and manufacturing of recycled plastics for use in consumer goods. The amended complaint alleges that "MRC [Polymers] and/or its affiliates" developed the

---

[1]MRC Polymers and Eberhardt are the only defendants that are parties to the instant appeal.

technology, which MRC Polymers denies.[2] MRC Polymers' recycled polyethylene terephthalate (rPET) business utilized the washline technology.

¶ 7    In 2012, MRC Polymers formed MRH to hold the intellectual property rights to the washline technology. MRC Polymers was the sole member of MRH, which, according to MRC Polymers' answer, lasted only until December 13, 2012. MRC Polymers alleges that after December 13, 2012, it had no interest in MRH.

¶ 8    The amended complaint alleges MRC Polymers also formed MRC Operations at the end of 2012 for the purpose of holding MRC Polymers' assets and that MRC Operations was wholly owned by MRH. In its counterclaim, MRC Polymers alleges that MRC Polymers and MRC Operations are involved in different products in different markets: MRC Polymers recycles plastics for use in the automobile industry, such as for automobile bumpers, while MRC Operations recycled plastics for use in consumer goods, such as plastic bottles. The amended complaint alleges that, while MRC Polymers transferred the washline technology to MRH and to MRC Operations, MRC Polymers retained ownership of the washline equipment and other related tools and equipment used in the recycling process. Eberhardt was the majority shareholder and an officer and director of both MRC Operations and MRH and was a former officer and director of MRC Polymers.

¶ 9    PP V (AIV) MRH, LLC (Pegasus), is a private, alternative-asset management firm that invests in the waste and recycling industries. The amended complaint alleges that, in 2013, Pegasus began negotiations with Eberhardt to acquire MRH's proprietary assets and intellectual property, including signing facility and equipment leases with and purchasing

---

[2]MRC Polymers claims that the technology was developed by a third party, Green Innovation Technologies, LLC, and was licensed by MRC Polymers.

certain tools and equipment from MRC Polymers. In particular, Pegasus sought to acquire the washline, which Eberhardt claimed possessed a competitive advantage in the recycled plastics industry. As part of the transaction, Pegasus, through Plastic Reclamation Partners, LLC (PRP), and Plastic Reclamation Partners Holdings, LLC (PRP Holdings), entered into various agreements, including (1) an asset contribution and sale agreement dated December 2, 2013, between PRP and PRP Holdings and MRH and MRC Operations (sale agreement); (2) an asset sale agreement dated December 2, 2013, between PRP and MRC Polymers, whereby MRC Polymers sold certain tools and equipment relating to the production and manufacture of rPET to PRP and PRP Holdings; (3) a lease agreement dated December 2, 2013, between MRC Polymers and PRP for the lease of an office and warehouse; and (4) an equipment lease agreement dated December 2, 2013, between MRC Polymers and PRP for the lease of plastics recycling equipment at the facility, including the washline equipment.

¶ 10                                II. Underlying Litigation[3]

¶ 11        On June 2, 2015, PRP Holdings sent MRH and MRC Operations a letter containing a "Demand for Indemnification Pursuant to the Asset Contribution and Sale Agreement," in which it asserted that the washline technology and equipment "was not anywhere close to capable of achieving the yield, throughput, uptime, labor cost and quality levels described in the Facility Projections" under the sale agreement. On September 9, 2016, Pegasus, PRP, and PRP Holdings (collectively, the Pegasus parties) filed a lawsuit in the superior court in the state of Delaware against MRH, MRC Operations, and Eberhardt, alleging that MRH and Eberhardt, its president, had fraudulently induced the plaintiffs into acquiring MRH's assets and

_____

[3]We discuss only the broad details of the underlying complaints here. To the extent that we are required to quote or analyze the complaints in detail, we do so in our analysis.

intellectual property by misrepresenting the capabilities of the assets, concealing material information, and falsifying data. The Pegasus parties further alleged that Eberhardt continued concealing the truth even after becoming the chief executive officer of PRP and a member of PRP's board of managers. The Pegasus parties also alleged that MRH breached its representations and warranties set forth in the sale agreement. The Pegasus parties alleged causes of action for (1) fraudulent inducement, (2) intentional misrepresentation, (3) contractual indemnification against MRH, and (4) breach of contract against MRH. Eberhardt moved to dismiss the lawsuit for lack of personal jurisdiction, and his motion was granted on January 26, 2017.

¶ 12    On December 23, 2016, PRP filed a lawsuit in the chancery division of the circuit court of Cook County (case No. 16 CH 16580) against MRC Polymers, seeking rescission of the facility lease agreement and the equipment lease agreement based upon fraudulent inducement. PRP alleged that the leases were part of the larger transaction that was the subject of the sale agreement and that, as a condition of the transaction, PRP was required to enter into the leases with MRC Polymers because PRP would process postconsumer recycled plastics at MRC Polymers' facility, using the assets and intellectual property acquired from MRH, including the equipment leased under the equipment lease agreement. PRP further alleged that Eberhardt, on behalf of MRC Polymers as its chairman of the board, officer, and shareholder, and on behalf of MRH as its chief executive officer and manager, fraudulently induced PRP Holdings and PRP to enter into the sale agreement and fraudulently induced PRP to enter into the leases by misrepresenting the functionality of the equipment and intentionally concealing data concerning the efficacy of the equipment.

¶ 13    After the claims against Eberhardt were dismissed in the Delaware lawsuit, on February 3, 2017, the Pegasus parties filed suit against Eberhardt in the law division of the circuit court of Cook County (case No. 17 L 001263), seeking damages arising out of Eberhardt's fraudulent inducement. The Pegasus parties set forth two causes of action against Eberhardt in his capacity as president of MRH: (1) fraudulent inducement and (2) fraudulent misrepresentation. On August 7, 2017, the Pegasus parties filed an amended complaint to add MRH and MRC Operations and the same claims against them as were filed in the Delaware suit. On November 13, 2017, the Pegasus parties filed a second amended complaint, adding MRC Polymers as a defendant. MRC Polymers was added to the existing counts based on alter ego liability, and a new count, in the alternative, alleged that MRC Polymers aided and abetted MRH, MRC Operations, and Eberhardt in the fraudulent inducement and fraudulent misrepresentations.[4]

¶ 14                                   III. Coverage Dispute

¶ 15    MRC Polymers is the named insured on a private company management liability insurance policy issued by plaintiff and tendered the defense of both lawsuits to plaintiff under the directors and officers and entity liability portion of its policy. In response, plaintiff filed the instant declaratory judgment action, seeking a declaration that it did not owe a duty to defend or indemnify defendants with respect to the underlying litigation. Defendants each filed counterclaims, seeking a declaration that they were entitled to coverage under plaintiff's policy. As relevant to the instant appeal, plaintiff claimed that defendants were excluded from coverage due to a "Products and Services Liability Exclusion" in the policy.

---

[4]According to defendants' motion for summary judgment, the two lawsuits were later consolidated.

¶ 16        The policy at issue was effective from November 15, 2016, through November 15, 2017, although MRC Polymers had similar policies during the 2014-15 and 2015-16 policy periods. Section IV of the policy concerned exclusions, including a "Products and Services Liability Exclusion," which provided:

> "This insurance does not apply to *Loss* for any *Claim* based upon, arising out of or in any way related to any actual or alleged *Claim* for a *Wrongful Act* by reason of or in connection with the efficacy, performance, health or safety standards and/or proprietary licensing rights for any services, products or technologies offered, promised, delivered, produced, processed, packaged, sold, marketed, distributed, advertised and/or developed by the *Insured Entity*."[5]

The policy further defined a "Wrongful Act" as follows:

> "*Wrongful Act* means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, breach of duty committed or attempted, or allegedly committed or attempted by [either an *Insured Individual* or an *Insured Entity*, depending on the type of coverage sought]."

¶ 17        On May 18, 2018, plaintiff filed a motion for summary judgment, claiming, *inter alia*, that the products and services liability exclusion barred coverage for the lawsuits because "both lawsuits are based upon, arising out of, and related to [the Pegasus parties'] allegations that MRC [Polymers] and Eberhardt misrepresented the efficacy and performance of technologies and equipment that MRC [Polymers] and Eberhardt offered, promised, delivered, sold, and developed," specifically, the washline technology and equipment.

---

[5]When quoting from the insurance policy, all italicized words are defined terms within the policy.

¶ 18    On July 6, 2018, defendants filed a response to plaintiff's motion for summary judgment and a cross-motion for summary judgment, claiming that the products and services liability exclusion was inapplicable because MRC Polymers did not own or develop the "product" at issue, namely, the intellectual property associated with the washline. Defendants claimed that MRC Polymers had no role in the underlying business transaction other than as "administrative lessor of certain buildings and equipment" and that Eberhardt represented MRC Polymers in connection with those leases but otherwise took no action on MRC Polymers' behalf.

¶ 19    Attached to defendants' cross-motion for summary judgment was the declaration of Paul Binks, president and chief executive officer of MRC Polymers at the time period at issue, who averred that, in 2009, MRC Polymers applied for and received a grant from the Illinois Department of Commerce and Economic Opportunity, which allowed MRC Polymers to construct a facility and install equipment to operate washline technology, whose purpose was to wash rPET flake. Binks averred that MRC Polymers did not own and had never owned the washline technology. Instead, Binks averred that a third party, Green Innovation Technologies, LLC (Green), developed the technology and that MRC Polymers and Green entered into a contract by which Green licensed the technology to MRC Polymers.

¶ 20    Binks averred that from January 2012 until December 2012, MRC Polymers had a separate division of its recycling business that it named Recycling Solutions, which operated the washline technology and equipment from MRC Polymers' facility and paid royalties to Green for the use of the technology. Eberhardt was the president of Recycling Solutions and reported directly to the MRC Polymers board of directors. In December 2012, MRC Polymers spun off Recycling Solutions and formed MRH. MRH then formed MRC Operations. MRC Polymers sold some of its assets relating to Recycling Solutions to MRH in an asset purchase agreement,

including any intellectual property rights related to Green's washline technology that MRC Polymers may have gained through operating the technology. Binks averred that "MRC Polymers was never privy to any of Green's developments or discussions of the Washline Technology during the period in which the Washline Technology was operated by Recycling Solutions." However, MRC Polymers did not sell the facility or the washline equipment as part of the sale. Instead, MRC Polymers entered into agreements with MRH in which MRC Polymers leased the equipment and the facility to MRH. Binks averred that, "[a]fter the spin-off, MRC Polymers had no further involvement with the Washline Technology."

¶ 21　　In response to defendants' cross-motion for summary judgment, plaintiff argued, *inter alia*, that defendants' extrinsic evidence was "irrelevant" and, to the extent that the court considered it, plaintiff requested further discovery pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013).

¶ 22　　On December 10, 2018, the trial court entered an order denying plaintiff's motion for summary judgment and staying defendants' cross-motion for summary judgment pending further discovery.

¶ 23　　On January 25, 2019, plaintiff filed a motion to reconsider, arguing that the trial court had erred in its application of the law and that the allegations against MRC Polymers were more than sufficient to trigger the products and services liability exclusion. On June 18, 2019, the trial court granted plaintiff's motion to reconsider and granted summary judgment in favor of plaintiff and against defendants.

¶ 24　　Defendants filed a motion to vacate the trial court's June 18, 2019, order or, in the alternative, to stay the case under the doctrine set forth by the supreme court in *Maryland*

*Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976). On October 17, 2019, the trial court denied defendants' motion. This appeal follows.

¶ 25                                          ANALYSIS

¶ 26      On appeal, defendants contend that the trial court erred in granting summary judgment in favor of plaintiff. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *XL Specialty Insurance Co. v. Performance Aircraft Leasing, Inc.*, 2019 IL App (1st) 181031, ¶ 62. " 'The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.' " *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

¶ 27      "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618,

624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 28 In the case at bar, defendants claim that the trial court erred in finding that plaintiff had no duty to defend them in the underlying litigation. Defendants claim that the trial court ignored allegations in the underlying complaint that would not fall within the exclusion and further claim that the trial court should have considered their extrinsic evidence that the exclusion did not apply.

¶ 29 In Illinois, the duties to defend and to indemnify are not coextensive, with the obligation to defend being broader than the obligation to pay. *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 168 Ill. App. 3d 361, 366 (1988). In determining whether an insurer has a duty to defend its insured, a court looks to the allegations in the underlying complaint and compares them to the relevant provisions of the insurance policy. *Outboard Marine Corp.*, 154 Ill. 2d at 107-08. This principle has been referred to as the " 'eight corners rule.' " *Country Mutual Insurance Co. v. Dahms*, 2016 IL App (1st) 141392, ¶ 37; see also *Farmers Automobile Insurance Ass'n v. Country Mutual Insurance Co.*, 309 Ill. App. 3d 694, 698 (2000). "If the facts alleged in the underlying complaint fall within, or potentially within,

11

the policy's coverage, the insurer's duty to defend arises." *Outboard Marine Corp.*, 154 Ill. 2d at 108. However, if it is clear from the face of the complaint that the allegations fail to state facts that bring the case within, or potentially within, the policy's coverage, an insurer may properly refuse to defend. *State Farm Fire & Casualty Co. v. Hatherley*, 250 Ill. App. 3d 333, 336 (1993) (citing *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991)).

¶ 30     "[W]here an exclusionary clause is relied upon to deny coverage, its applicability must be clear and free from doubt because any doubts as to coverage will be resolved in favor of the insured." *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 367; see also *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 456 (2010) (" 'provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer' " (quoting *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997))). " 'Absent absolute clarity on the face of the complaint that a particular policy exclusion applies, there exists a potential for coverage and an insurer cannot justifiably refuse to defend.' " *Lorenzo v. Capitol Indemnity Corp.*, 401 Ill. App. 3d 616, 620 (2010) (quoting *Novak v. Insurance Administration Unlimited, Inc.*, 91 Ill. App. 3d 148, 151 (1980)). "[W]here the language of an insurance policy is clear and unambiguous, it will be applied as written." *Hatherley*, 250 Ill. App. 3d at 337.

¶ 31     In the case at bar, we are asked to consider the applicability of the products and services liability exclusion, which provided:

> "This insurance does not apply to *Loss* for any *Claim* based upon, arising out of or in any way related to any actual or alleged *Claim* for a *Wrongful Act* by reason of or in connection with the efficacy, performance, health or safety standards and/or proprietary licensing rights for any services, products or technologies offered, promised, delivered,

produced, processed, packaged, sold, marketed, distributed, advertised and/or developed by the *Insured Entity*."

Defendants concede that there are allegations in the underlying complaints that would trigger this exclusion. However, they claim that there are also allegations that would *not* fall within the exclusion and, therefore, they are entitled to coverage. We do not find this argument persuasive.

¶ 32      Defendants point to two types of allegations that they claim take the underlying complaints out from under the exclusion. First, they claim that there are allegations that a different entity, not MRC Polymers, developed the washline technology. For instance, they point to allegations referring to the washline technology as being "developed by MRH" or developed by MRC Polymers "or its affiliates." Defendants also claim that these allegations are supported by the sale agreement and its schedules, which they argue gives those allegations "greater force than the merely conclusory assertions of ownership in the text of the complaint." According to defendants, if another entity developed the technology, the exclusion does not apply.

¶ 33      Additionally, defendants claim that the underlying complaints include causes of action against MRC Polymers that are based on vicarious liability. Specifically, defendants point to a claim based on alter ego liability and a claim, made in the alternative, for aiding and abetting. Defendants argue that, by definition, if MRC Polymers incurs a loss because of an act committed by someone else, then the claim falls outside of the exclusion. Consequently, defendants claim that the presence of these counts shows that there were claims that could fall within the policy's coverage and would not fall within the exclusion.

¶ 34      Defendants correctly note that, if any part of the underlying complaint sets forth alleged facts that are within the scope of coverage, the duty to defend arises. Our supreme court has

13

made clear that, "if several theories of recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy." *General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 (2005) (citing *Wilkin Insulation Co.*, 144 Ill. 2d at 73). However, we cannot agree with defendants' position that such is the case here.

¶ 35 Defendants read the exclusion as applying only in the instance where defendants "offered, promised, delivered, produced, packaged, sold, marketed, distributed, advertised and/or developed" the washline technology to the Pegasus parties. Consequently, as noted, they point to allegations in the underlying complaints that they claim show that another party offered or developed[6] the technology, suggesting that if another party did so, they could not be found to have done so. However, as an initial matter, there is nothing to suggest that only one party may be found to have offered or developed the technology. Certainly, in a commercial transaction, there may be many different actors who take part in different aspects of the transaction.

¶ 36 More importantly, however, defendants' argument presupposes that the exclusion applies only where the insured has offered the product directly to the end user. This reading appears nowhere in the language of the exclusion. Instead, the exclusion applies to losses from any claim "based upon, arising out of or in any way related to any actual or alleged *Claim* for a *Wrongful Act* by reason of or in connection with the efficacy, performance, health or safety standards and/or proprietary licensing rights for any services, products or technologies offered, promised, delivered, produced, processed, packaged, sold, marketed, distributed, advertised

---

[6]We recognize that the exclusion encompasses more than "offer[ing]" or "develop[ing]" the technology. However, as the language of the exclusion is quite lengthy, the parties have selected several terms as a shorthand throughout the litigation, which we do, as well. Any reference to "offer[ing]" or "develop[ing]" the technology should be read to encompass the entire scope of the conduct referred to in the exclusion.

and/or developed by the *Insured Entity*." "An insurance policy is a contract between the company and the policyholder, the benefits of which are determined by the terms of the contract unless the terms are contrary to public policy." *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 453 (1998). In construing the language of an insurance policy, a court must ascertain and give effect to the intention of the parties as expressed in their agreement. *Villicana*, 181 Ill. 2d at 441. "To that end, terms utilized in the policy are accorded their plain and ordinary meaning. [Citation.] We will apply those terms as written unless such application contravenes public policy. [Citation.]" *Villicana*, 181 Ill. 2d at 441-42.

¶ 37    The language used in the exclusion is extremely broad. It precludes coverage for (1) a loss (2) "based upon, arising out of or in any way related to" (3) a claim for a wrongful act (4) "by reason of or in connection with" the efficacy, performance, health or safety standards and/or proprietary licensing rights for any services, products, or technologies (5) "offered, promised, delivered, produced, processed, packaged, sold, marketed, distributed, advertised and/or developed" by the insured entity—here, MRC Polymers. Thus, the language of the exclusion lends itself to consideration of several questions. First, was there a service, product, or technology offered or developed by MRC Polymers? If so, is there a claim for a wrongful act in connection with the performance of that service, product, or technology? Finally, is there a loss based on that claim? If the answers to all three questions are yes, then the plain language of the exclusion operates to preclude coverage.

¶ 38    Here, comparing the allegations in the underlying complaints to the language of the exclusion contained in the insurance policy, it is clear that the exclusion applies to preclude coverage for the claims against MRC Polymers. See *Outboard Marine Corp.*, 154 Ill. 2d at

107-08 (in determining whether an insurer has a duty to defend its insured, a court looks to the allegations in the underlying complaint and compares them to the relevant provisions of the insurance policy). The allegations of the underlying complaints allege that MRC Polymers sold its rights to the washline technology to MRH and MRC Operations, which, in turn, entered into the sale agreement at issue in the underlying litigation. The underlying complaints also allege that the defendants in the underlying litigation engaged in wrongful acts in connection with the performance of the washline technology. Specifically, the underlying complaints allege that the underlying defendants fraudulently induced the Pegasus parties to enter into the sale agreement by "outright lying" about the capability of the technology, concealing material information about the technology's effectiveness from a customer with firsthand experience, and falsifying data that they provided to the Pegasus parties in support of the transaction. The underlying complaints further allege that the Pegasus parties incurred substantial damages as a result of the underlying defendants' conduct, including the $26 million involved in the sale agreement and an additional $15 million that they invested to cover operating losses and to purchase additional machinery, and seek recovery for their damages, including the imposition of punitive damages. Any monetary judgment that MRC Polymers would be required to pay as a result of the underlying litigation is expressly defined as a "loss" under the insurance policy. Thus, the claims against MRC Polymers arise out of the claims for wrongful acts in connection with the efficacy or performance of services, products, or technologies sold by MRC Polymers. Consequently, they would fall within the exclusion. Importantly, MRC Polymers does not dispute, and has never disputed, that it sold its rights to the washline technology to MRH and MRC Operations. As noted, "[w]here a policy provision is clear and unambiguous, its language must be taken in its 'plain, ordinary and popular sense.' " *Wilkin*

16

*Insulation Co.*, 144 Ill. 2d at 74 (quoting *Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill. App. 3d 115, 121 (1973)). In the case at bar, the claims against MRC Polymers fall within the clear and unambiguous language of the exclusion and, therefore, we must find that they are not covered under the policy.

¶ 39    We similarly find unpersuasive defendants' claim that the allegations against MRC Polymers were all based on Eberhardt's conduct and that it would be "more reasonable" to infer that Eberhardt was acting on behalf of MRH and MRC Operations, not MRC Polymers. In examining the insurance policy, any doubts as to coverage will be resolved in favor of the insured. *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 367. However, this does not mean that we may ignore the actual allegations of the complaint to determine what is the "more reasonable" interpretation. Both complaints expressly allege that Eberhardt was acting on behalf of MRC Polymers. We cannot disregard these allegations simply because defendants disagree with them.

¶ 40    Finally, defendants argue that the trial court erred in refusing to consider their extrinsic evidence as to their involvement with the washline technology. "[A] circuit court may, under certain circumstances, look beyond the underlying complaint in order to determine an insurer's duty to defend \*\*\*." *Wilson*, 237 Ill. 2d at 459.

    " 'It is certainly true that the duty to defend flows in the first instance from the allegations in the underlying complaint; this is the concern at the initial stage of the proceedings when an insurance company encounters the primary decision of whether to defend its insured. However, if an insurer opts to file a declaratory proceeding, we believe that it may properly challenge the existence of such a duty by offering evidence to prove that the insured's actions fell within the limitations of one of the policy's exclusions. [Citations.] The only

17

time such evidence should not be permitted is when it tends to determine an issue crucial to the determination of the underlying lawsuit [citations] ***.' " *Wilson*, 237 Ill. 2d at 461 (quoting *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301, 304-05 (1983)).

Thus, if there is no concern that a crucial issue will be determined, the trial court may consider evidence that would otherwise be appropriate at that stage of the proceedings. See *Wilson*, 237 Ill. 2d at 462 (noting that *Envirodyne Engineers* involved evidence available in summary judgment proceedings, while *Wilson* involved evidence available in a grant of judgment on the pleadings).

¶ 41 In the case at bar, defendants claim that the trial court should have considered the declaration of Binks, who averred that MRC Polymers did not own and did not develop the washline technology. The trial court declined to consider this evidence, basing its decision on the language of the pleadings alone. We agree with the trial court that extrinsic evidence was not required in the instant case. As noted, the exclusion is applicable because the claims against MRC Polymers arise from claims for wrongful acts in connection with the efficacy or performance of services, products, or technologies sold by MRC Polymers. Binks' declaration does not contradict or change the fact that MRC Polymers sold its rights to the washline technology to MRH and MRC Operations, giving rise to the instant action through its subsequent sale to the Pegasus parties. Consequently, there was no need to consider extrinsic evidence, and the trial court did not err in declining to consider it.

¶ 42 Moreover, even if it had been considered, Binks' declaration would not affect the applicability of the exclusion. Binks averred that MRC Polymers licensed the washline technology from Green and subsequently sold some of the assets related to Recycling Solutions

to MRH, which included rights to the washline technology. Thus, Binks' declaration in fact supports the applicability of the exclusion in the instant case, rather than contradicting it, and would not have changed the outcome even if it had been considered.

¶ 43                                CONCLUSION

¶ 44    For the reasons set forth above, the judgment of the trial court is affirmed. The products and services liability exclusion bars coverage for the claims against defendants in the underlying litigation, and the trial court properly found that plaintiff did not have a duty to defend them.

¶ 45    Affirmed.

**No. 1-19-2337**

| | |
|---|---|
| **Cite as:** | *Hanover Insurance Co. v. MRC Polymers, Inc.*, 2020 IL App (1st) 192337 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017-CH-3929; the Hon. Michael T. Mullen, Judge, presiding. |
| **Attorneys for Appellant:** | Scott C. Solberg, James W. Joseph, and Caroline P. Malone, of Eimer Stahl LLP, and John M. George Jr., of Katten & Temple LLP, both of Chicago, for appellants. |
| **Attorneys for Appellee:** | David F. Cutter, Ryan M. Henderson, and Ommid C. Farashahi, of BatesCarey LLP, of Chicago, for appellee. |