2024 IL App (1st) 231210-U

THIRD DIVISION
March 27, 2024

No. 1-23-1210

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ADMIRAL INSURANCE CO., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2011 CH 02244 |
| | ) | |
| TRACK GROUP, INC. f/k/a SECUREALERT, INC., and | ) | |
| JEFFREY MOHAMMED ABED, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON | ) | |
| SUBSCRIBING TO POLICY NO. CJ10028219, | ) | Honorable |
| | ) | Caroline K. Moreland, |
| Intervenor-Appellant. | ) | Judge Presiding. |

_____

JUSTICE VAN TINE delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    ***Held*:**  We reverse the circuit court's judgment that a professional liability carrier does not owe its insured coverage, where potential coverage is not excluded by the plain language of the insurance policy.

¶ 2    This appeal concerns an insurance coverage dispute between a general liability carrier and a professional liability carrier. Certain Underwriters at Lloyd's, London Subscribing to Policy No. CJ10028219 (Underwriters) and Admiral Insurance Co. (Admiral) both insured Track Group, Inc., a company in the business of electronically monitoring individuals using ankle monitors. Track Group was sued after a person wearing the ankle monitor sustained severe injuries while driving his vehicle. Underwriters has paid the costs of Track Group's defense of the suit thus far, but it argues that Admiral should share in the costs, as it believes both insurance policies provide coverage in this case. However, the circuit court held that Admiral does not owe coverage under the terms of its insurance policy with Track Group. Underwriters appeals that decision. For the following reasons, we reverse.

¶ 3                                    BACKGROUND

¶ 4    Track Group is in the business of monitoring individuals wearing ankle monitors. It utilizes, primarily, an ankle monitor, computer software, the global positioning system (GPS), and smartphone applications to do so. Underwriters issued Track Group a general liability insurance policy, while Admiral issued a professional liability insurance policy. Track Group sought coverage under both policies in connection with a personal injury lawsuit filed against it in Los Angeles, California. The plaintiff in that suit, Jeffrey Mohamed Abed, alleged that his leg was torn from his body after his foot, on which he was wearing the ankle monitor, became lodged between the gas and brake pedals in the vehicle he was driving. In his complaint, Abed alleged that Track Group is "engaged in the business of designing, manufacturing, assembling, merchandising,

marketing, selling, and or distributing" the ankle monitor at issue here. Both policies covered the time period relevant to Abed's lawsuit. Underwriters agreed to defend Track Group, whereas Admiral denied coverage and filed a declaratory action, contending that it does not owe coverage under these circumstances.

¶ 5    In the declaratory action, Admiral and Underwriters eventually filed cross motions for summary judgment. Admiral argued that its policy did not provide coverage because the ankle monitor is neither computer hardware nor an electronic component, which is a requirement for coverage under its professional services liability coverage. Underwriters countered, contending that the ankle monitor constitutes computer hardware, as the unit can retrieve, process, and store data, and therefore falls under the terms of the policy.

¶ 6    The circuit court granted Admiral's motion for summary judgment and denied Underwriters' motion for summary judgment. First, the court held that Admiral did not owe Track Group a duty to defend. The court reasoned that Admiral's policy "provides coverage for negligent acts or errors in monitoring the location of the people wearing the ankle monitors and not for injury arising from any alleged negligent design." In other words, because Abed's injury did not arise from Track Group's monitoring of him, the policy did not provide coverage. The court also found that the policy provides coverage only for the smaller internal components of the ankle monitor and not the entire device itself. Because Abed did not allege that the design of the internal components of the monitor resulted in his injury, the court held that Admiral's coverage is not triggered. Second, the court held that Underwriters is not entitled to equitable contribution from Admiral because such contribution is allowed only where the particular risk (here, Abed's injury) in the case is covered by both policies, and the court already held that the risk here is not covered by the terms of Admiral's policy.

¶ 7    Underwriters appeals.

¶ 8                              ANALYSIS

¶ 9    On appeal, Underwriters argues that the circuit court erred in granting summary judgment in favor of Admiral, contending that the court's interpretation of the Admiral policy was overly narrow. Underwriters argues that Admiral's policy covers the injury at issue here, and, alternatively, that equitable principles require Admiral to share in the costs of defending the injury lawsuit.

¶ 10    We review a circuit court's decision to grant a motion for summary judgment *de novo*. *Country Mutual Insurance Co. v. Under Construction and Remodeling, Inc.* 2021 IL App (1st) 210600, ¶ 23. *De novo* consideration means we perform the same analysis that a circuit court judge would perform. *Country Mutual Insurance Co.*, 2021 IL App (1st) 210600, ¶ 23. " 'The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.' " *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

¶ 11    " 'An insurance policy is a contract between the company and the policyholder, the benefits of which are determined by the terms of the contract unless the terms are contrary to public policy.' " *Hanover Insurance Co. v. MRC Polymers, Inc.*, 2020 IL App (1st) 192337 (quoting *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 453 (1998)). In construing the language of an insurance policy, a court must ascertain and give effect to the intention of the parties as expressed in their agreement. *Villicana*, 181 Ill. 2d at 441. "To that end, terms utilized in the policy are accorded their plain and ordinary meaning. [Citation.] We will apply those terms as

written unless such application contravenes public policy. [Citation.]" *Villicana*, 181 Ill. 2d at 441-42.

¶ 12    Moreover, where "policy language is susceptible to more than one reasonable interpretation, it is considered ambiguous and will be construed strictly against the insurer." *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 31 (citing *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 293 (2001)). If competing reasonable interpretations of a policy exist, "a court may not choose which interpretation it will follow." *Id.* (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-109 (1992)). "Rather, under those circumstances, the court must construe the policy in favor of the insured and against the insurer that drafted the policy." *Id.* (citing *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 141 (1999)). We construe the policy as a whole, "giving effect to each provision where possible because we must assume that the provision was intended to serve a purpose." *Id.* (citing *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006)). Finally, "[i]f the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the insured in the underlying action." *Crum and Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393 (1993) (citing *Outboard Marine Corp.*, 154 Ill. 2d at 108).

¶ 13    With these principles in mind, we analyze the relevant portions of Admiral's policy to determine whether the facts of Abed's case against Track Group "potentially fall" within the terms of the policy. The starting point in our analysis is "Coverage A (Technology Errors and Omissions and Professional Liability)" of Admiral's policy, which provides:

> "We will pay on behalf of the **Insured** those amounts, in excess of the **Third Party Wrongful Act Deductible** and subject to the Third Party Limits of Liability as

stated on the Declarations, which the **Insured** is legally obligated to pay as

**Damages** and **Claim Expenses** because of a **Claim**, and which directly results from

the following **Wrongful Acts** committed by the **Insured**:

A. **Professional Services Wrongful Acts**; or

B. **Technology Products Wrongful Acts**; ***." (Emphasis in insurance policy.)

According to the plain language of this section, Admiral is potentially liable for wrongful acts

arising out of the provision of "professional services" and "technology products."

¶ 14 The policy includes a general exclusion for bodily injury and property damage. However,

that exclusion does not apply to bodily injury arising out of the provision of "professional

services." In other words, Admiral's policy could potentially cover bodily injury arising out of the

provision of "professional services." Thus, we look to relevant policy definitions to determine

what "professional services" covers.

¶ 15 "Professional services" is a defined term in "Item I" of Admiral's policy's declarations. It

is defined as "Technology Services Including Probation/Alternative Incarceration Monitoring

Services for others for a fee." "Technology Services" in turn "means any of the following services

performed by or on behalf of the Named Insured for others for compensation:

1. Computer hardware or electronic component design, integration,

maintenance, repair or support;

2. Computer firmware or software design, development, integration

and support;

3. Computer systems design, integration and analysis;

4. Information technology:

a. Consulting,

b. Staff augmentation; or

c. Outsourcing;

5. Internet service provider (ISP);

6. Network:

a. Hosting;

b. Management;

c. Security; or

d. Security outsourcing;

7. Records management or storage;

8. Search engine optimization and related services;

9. Value added resale of computer hardware or software;

10. Web portal services;

11. Web site design or hosting;

12. Application Service Provider, Software as a Service or

13. Training involving any of the above."

¶ 16    The question before us is whether one or more of the above potentially covers Abed's bodily injury. We find "1. Computer hardware or electronic component design, integration, maintenance, repair or support" possibly relevant to the ankle monitor at issue here. At the summary judgment stage in the declaratory action, Admiral and Underwriters disagreed on the issue of whether the ankle monitor constitutes computer hardware or electronic component design. This question is critical because if the ankle monitor *does* constitute computer hardware or electronic component design, then Admiral potentially owes coverage under its policy. "Computer hardware" and "electronic component", however, are not defined terms in the policy. Where an

insurance policy does not define important terms, we afford them their plain, ordinary, and popular meanings by looking to their dictionary definitions. *Valley Forge*, 223 Ill. 2d at 367 (citing *Outboard Marine*, 154 Ill. 2d at 115-17)).

¶ 17     A computer is a "programmable usually electronic device that can store, retrieve, and process data." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/computer (last visited Feb. 29, 2024). It is undisputed that the ankle monitor is an electronic device that consists of four components: 1) cellular module, 2) GPS module, 3) internal CPU (central processing unit), and 4) radio frequency module. The ankle monitor's ability to store and retrieve data is not in dispute. The monitor is capable of storing tracking data for up to 18 days, and it retrieves the stored data and forwards it to the monitoring center. The central dispute concerns the ankle monitor's ability to process data.

¶ 18     As mentioned above, one of the four components of the ankle monitor is an internal central processing unit. A central processing unit is "the component of a computer system that performs the system's basic operations (such as processing data), that exchanges data with the system's memory or peripherals, and that manages the system's other components." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/central%20processing%20unit (last visited Feb. 29, 2024). Thus, the central processing unit, which is indisputably a component of the ankle monitor, has the capability to process data. In addition to the dictionary definition, we note that Underwriters has explained how the ankle monitor processes data. The ankle monitor can make and receive calls, generate alarms, receive radio frequency transmissions, and communicate movements to Track Group.

¶ 19     The ankle monitor is an electronic device that can store, retrieve, and process data. Based on the foregoing analysis, we find that, at the very least, the ankle monitor is potentially a

computer. Moreover, the ankle monitor likely constitutes "hardware" under the dictionary definition of that word: "the physical components (such as electronic and electrical devices) of a vehicle (such as a spacecraft) or an apparatus (such as a computer)." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/hardware (last visited Mar. 4, 2024). Because the ankle monitor is potentially computer hardware, we hold that it is potentially covered by Admiral's policy. Again, potential coverage is all that is required to trigger an insurer's duty to defend its insured. *Outboard Marine Corp.*, 154 Ill. 2d at 108.

¶ 20     Because we hold that the facts of Abed's lawsuit against Track Group potentially fall within the terms of the policy, we need not reach the question of whether the principles of equitable contribution apply to require Admiral to share in the costs of defending the underlying injury lawsuit. See *Horwitz v. Sonnenschein Nath & Rosenthal*, 2018 IL App (1st) 161909, ¶ 44 (citing *Scott & Fetzer Co. v. Montgomery Ward & Co., Inc.*, 129 Ill. App. 3d 1011, 1022 (1984)) ("Equitable principles do not intervene to give a plaintiff the best possible outcome or merely to add another weapon to a plaintiff's arsenal. They enter the picture if and only if the legal remedy cannot make a plaintiff whole.").

¶ 21                                    CONCLUSION

¶ 22     For these reasons, we reverse the circuit court's judgment.

¶ 23     Reversed.